Slip Op. 13- 114

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| **U.K. CARBON AND GRAPHITE CO., LTD.,** | |
| **Plaintiff,** | |
| **v.** | |
| **UNITED STATES,** | **Before:  Gregory W. Carman, Judge** |
| **Defendant,** | **Court No. 12-00242** |
| **and** | |
| **SGL CARBON, LLC and SUPERIOR GRAPHITE CO.,** | |
| **Defendant-Intervenors.** | |

## <u>OPINION & ORDER</u>

[Commerce's Circumvention Final Determination is sustained.]

Dated: August 29, 2013

*Jeffrey S. Neeley*, *Michael S. Holton*, and *Stephen W. Brophy*, Barnes, Richardson & Colburn, of Washington, DC, for Plaintiff.

*Melissa M. Devine*, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, for Defendant.  With her on the brief were *Stuart F. Delery*, Acting Assistant Attorney General, *Jeanne E. Davidson*, Director, and *Reginald T. Blades, Jr.*, Assistant Director.  Of counsel on the brief was *Daniel J. Calhoun*, Attorney, Office of the Chief Counsel for Import Administration, United States Department of Commerce.

*Mary T. Staley, David A. Hartquist, Katherine E. Wang* and *R. Alan Luberda*, Kelley Drye & Warren, LLP, of Washington, DC, for Defendant-Intervenors.

CARMAN, JUDGE: Plaintiff U.K. Carbon and Graphite Company, Ltd. ("Plaintiff" or "UKCG") contests the final determination by Defendant United States Department of Commerce ("Defendant" or "Commerce") regarding the circumvention[1] inquiry related to the antidumping duty order covering small diameter graphite electrodes from the People's Republic of China ("China").  *See Small Diameter Graphite Electrodes From the People's Republic of China: Affirmative Final Determination of Circumvention of the Antidumping Duty Order*, 77 Fed. Reg. 47,596 (Aug. 9, 2012) ("*Final Determination*"), Part 2, P.R.[2] 76, and accompanying *Issues and Decision Memorandum for the Final Determination of the Anticircumvention Inquiry* (July 31, 2013) ("*I&D Memo*"), Part 2, P.R. 73.  The Court denies Plaintiff's motion for judgment on the agency record and sustains Defendant's *Final Determination*.

BACKGROUND

A.      **Antidumping Duty Order**

The product at issue is small diameter graphite electrodes ("SDGE").  In 2009,

---

[1]  "Circumvention" and "anticircumvention" are used interchangeably throughout the administrative record and this opinion.

[2]  "P.R." refers to the public administrative record and "C.R." refers to the confidential administrative record.  The public and confidential record each appear in two parts on separate compact discs.

Commerce imposed an antidumping duty order upon imports of SDGE from China.

*Antidumping Duty Order: Small Diameter Graphite Electrodes from the People's Republic of*

*China*, 74 Fed. Reg. 8,775 (Feb. 26, 2009) ("*AD Order*" or "*SDGE Order*").  The scope of

the *AD Order* covers:

> all small diameter graphite electrodes of any length, whether
> or not finished, of a kind used in furnaces, with a nominal or
> actual diameter of 400 millimeters (16 inches) or less, and
> whether or not attached to a graphite pin joining system or any
> other type of joining system or hardware.  The merchandise
> covered by this order also includes graphite pin joining
> systems for small diameter graphite electrodes, of any length,
> whether or not finished, of a kind used in furnaces, and
> whether or not the graphite pin joining system is attached to,
> sold with, or sold separately from, the small diameter graphite
> electrode. Small diameter graphite electrodes and graphite pin
> joining systems for small diameter graphite electrodes are most
> commonly used in primary melting, ladle metallurgy, and
> specialty furnace applications in industries including
> foundries, smelters, and steel refining operations.   Small
> diameter graphite electrodes and graphite pin joining systems
> for small diameter graphite electrodes that are subject to this
> order are currently classified under the Harmonized Tariff
> Schedule of the United States ("HTSUS") subheading
> 8545.11.0000. The HTSUS number is provided for convenience
> and customs purposes, but the written description of the scope
> is dispositive.

*Id*. at 8,775.

## B.    Circumvention Inquiry

On October 12, 2010, domestic producers of SDGE—SGL Carbon LLC and

Superior Graphite Company, Defendant-Intervenors in the instant case (collectively

referred to as "Defendant-Intervenors" or "Petitioners")—requested that Commerce

conduct a scope or an anticircumvention inquiry on SDGE produced by UKCG from

Chinese manufactured artificial/synthetic graphite forms.  *See Petitioners' Request for*

*Scope Review or Anticircumvention Inquiry* (Oct. 12, 2010) ("*Initiation Request*"), Part 1, P.R.

1.  Petitioners alleged that UKCG was part of "an ongoing scheme to evade payment of

antidumping duties under the *SDGE Order*" with Chinese producers.  *Id.* at 1-2.

Petitioners alleged that UKCG was first importing unfinished SDGE from China to the

U.K. "for minor completion or assembly" then exporting to the U.S., thereby

circumventing the *AD Order* duty assessment by improperly claiming the U.K. as the

country of origin on entry papers.  *Id.* at 2.

       Petitioners asserted the SDGE that UKCG imported was "for every relevant

purpose an unfinished graphite electrode subject to the antidumping duty order when

it leaves China," because "[a]ll of the physical, chemical and performance characteristics

of an electrode have been given to the product in China."  *Id.* at 14.  Petitioners

explained that

              [i]t is an electrode in unfinished form at that point, regardless of
              whether it is called a rod or an electrode.  The rod or unfinished
              electrode needs only final finishing (sizing, threading, fitting
              ends of electrode with a graphite pin joining system, etc.)
              [which] are merely machining operations and do not impart

the essential performance characteristics of the product.

*Id.* at 14 (emphasis added).

Commerce acknowledged that there was "substantial record evidence which may support the initiation of either" a scope inquiry or an anticircumvention inquiry. *Small Diameter Graphite Electrodes From the People's Republic of China: Initiation of Anti-Circumvention Inquiry*, 76 Fed. Reg. 14,910, 14,912 (Mar. 18, 2011) ("*Initiation Notice*"). Commerce decided that an anticircumvention inquiry was the more appropriate avenue given the "specificity" of the allegation to a single company and "certain record information as to the timing of the pattern of trade." *Id.*

UKCG provided timely responses to Commerce's information requests, and all parties submitted timely comments regarding surrogate country and surrogate value selection.   Def.'s Mem. in Opp'n to Pl.'s R. 56.2 Mot. for J. upon the Agency Record ("Def.'s Opp'n") at 5.   Commerce also conducted a verification of UKCG's questionnaire responses at two of its U.K. facilities during February 16-17, 2012.  Pl. UKCG's Mem. of Law in Supp. of Their R. 56.2 Mot. for J. on the Agency Record ("Pl.'s Mot.") at 6, 38; Def.'s Opp'n at 5.

### C.    Preliminary Determination

In June 2012, Commerce subsequently issued a preliminary affirmative determination of circumvention.  *See Small Diameter Graphite Electrodes From the People's*

*Republic of China: Affirmative Preliminary Determination of Circumvention of the*

*Antidumping Duty Order and Extension of Final Determination*, 77 Fed. Reg. 33,405 (June 6,

2012) ("*Preliminary Determination*").  In its *Preliminary Determination*, Commerce first

found that the products exported by UKCG to the U.S. were completed or assembled in

the U.K. from "unfinished" Chinese-origin inputs "subject to" the *AD Order*, based

upon the scope language and product descriptions from the petition and the report of

the International Trade Commission ("ITC").  *Id.* at 33,410-11; *Small Diameter Graphite*

*Electrodes from China*, Inv. No. 731-TA-1143 (Final), ITC Pub. 4062 (Feb. 2009) ("ITC

Report").  Commerce therefore determined that it was appropriate to use the surrogate

value methodology from antidumping proceedings for non-market economy ("NME")

countries.  *Id.* at 33,407-08.

Second, Commerce determined to use surrogate values from the Ukraine to

analyze whether the value of the merchandise produced in China constituted a

"significant portion" of the value of the merchandise exported to the United States.  *Id.*

at 33,407-08, 33,415.  Third, Commerce determined that the value of UKCG's processing

in the U.K. was "minor and insignificant."  *Id.*  at 33,417.  Commerce therefore

preliminarily determined that UKCG had circumvented the antidumping duty order.

*Id.*

### D.    Final Determination

A couple months after issuing its *Preliminary Determination*, Commerce issued its

*Final Determination*.  *See* 77 Fed. Reg. 47,596.  The significant changes in the *Final*

*Determination* from the *Preliminary Determination* are summarized as follows.  First,

regarding the product covered by the scope language, Commerce "specifically refuted

UKCG's allegation that the agency manipulated language from the petition to

supplement its textual analysis," and after taking into account evidence submitted by

UKCG, Commerce "determined that this evidence 'd[id] not overcome [the] explicit

inclusion' of unfinished [SDGE] in the order."  Def.'s Opp'n at 7 (*quoting I&D Memo* at

6).  Second, Commerce added HTSUS 3801.10 to the description of the *AD Order*'s scope

for "convenience and customs purposes."  *Id*. at 8.

Third, with respect to surrogate values, Commerce noted the circumvention

provisions of the antidumping statute do not "prescribe a specific method to determine

whether the value of the merchandise produced in China is a significant portion of the

value of the merchandise exported to the United States."  *Id*.  Noting that the

antidumping statute "elsewhere presumes that costs and prices" from a NME are

"inherently unreliable," Commerce, "consistent with its past practice, found it

reasonable to use surrogate values" from the Ukraine.  *Id*.  However, Commerce also

noted that its circumvention analysis showed the Chinese inputs made up a significant

portion of the value UKCG's U.S. exports, "regardless of whether it used Ukrainian surrogate values or UKCG's purchase price," and that the choice to use surrogate values was therefore not essential to the outcome.  *Id*. (*citing I&D Memo* at 7).

Fourth, Commerce rejected UKCG's complaints about its value-added calculation under 19 U.S.C. § 1677j(b)(2)(E) (2006)[3] for three reasons: (1) the other statutory factors in 19 U.S.C. § 1677j(b)(2)(A)-(D), which were not challenged by UKCG, supported Commerce's analysis and (b)(2)(E) was therefore not dispositive; (2) Commerce's "qualitative finding as to value-added was sufficient;" and (3) Commerce's "use of UKCG's processing costs, rather than UKCG's actual costs of Chinese-origin inputs, when calculating quantitative value-added was proper."  *Id*. at 8-9 (*citing I&D Memo* at 8-12).

Fifth, relating to the cash deposit requirements, Commerce explained that it is "appropriate and consistent with past practice to assign UKCG's exports of SDGE to the United States the rate applicable to the relevant [Chinese]-producer of the subject input" since 19 U.S.C. § 1677j(b)(1)(E) requires Commerce to prevent evasion of antidumping duties "irrespective of the exporter" of the subject merchandise being entered into the U.S.  *Id*. at 9 (*citing I&D Memo* at 14-15).

_____

[3]  All references to the United States Code refer to the 2006 edition, unless otherwise stated.

## STANDARD OF REVIEW

The Court has jurisdiction pursuant to 28 U.S.C. § 1581(c).  The Court sustains

circumvention determinations, findings or conclusions by Commerce unless they are

"unsupported by substantial evidence on the record, or otherwise not in accordance with

law." 19 U.S.C. § 1516a(b)(1)(B)(i).  Substantial evidence is "more than a mere scintilla. It

means such relevant evidence as a reasonable mind might accept as adequate to support

a conclusion."  *Universal Camera Corp. v. Nat'l Labor Relations Bd.*, 340 U.S. 474, 477 (1951)

(internal quotation omitted).  Courts "look for a reasoned analysis or explanation for an

agency's decision as a way to determine whether a particular decision is arbitrary,

capricious, or an abuse of discretion."  *Wheatland Tube Co. v. United States*, 161 F.3d 1365,

1369 (Fed. Cir. 1998).

## DISCUSSION

Commerce has two types of inquiries available when examining allegations that a

particular product should be covered by an existing antidumping order: scope inquiry or

circumvention inquiry.  Petitioners requested an examination of UKCG's product

through both of these avenues, in the alternative.  *See* Def.'s Opp'n at 4; *accord Initiation*

*Request*.  In a scope inquiry, Commerce analyzes "whether a particular product is

included within the scope of an order" pursuant to regulatory criteria set forth in 19

C.F.R. § 351.225(k).  In a circumvention inquiry, Commerce analyzes whether a product

outside an order's literal scope should nevertheless be included within the scope to

prevent circumvention of antidumping and countervailing duty orders pursuant to

statutory criteria set forth in 19 U.S.C. § 1677j[4] and regulatory criteria in 19 C.F.R.

§ 351.225(g)-(j).

Based on these particular facts, Commerce decided that the issues raised by the

parties are "better addressed in the context of an anticircumvention proceeding" rather

than a scope inquiry. *Initiation Notice*, 76 Red. Reg. at 14,912. Commerce explained that

"due to the specificity of Petitioners' request as it pertains to a particular company (*i.e.*,

UKCG) and certain record information as to the timing of the pattern of trade. . .,

[Commerce] has determined that a decision to initiate an anti-circumvention inquiry is

the most appropriate course of action to address Petitioners' concerns at present." *Id*.

An anticircumvention inquiry is similar to the more frequently invoked scope

inquiry because they are both subsets of a scope ruling. The criteria for circumvention

and scope inquiries differ, however:

> [A]nticircumvention inquiries are not like traditional scope
> inquiries conducted pursuant to 19 C.F.R. § 351.225(k).
> Instead, anticircumvention determinations are a special subset

---

[4] There are four types of circumvention inquires: (a) merchandise completed/assembled in the United States; (b) merchandise completed/assembled in a third country; (c) minor alterations of merchandise; and (d) later-developed merchandise. *See* 19 U.S.C. § 1677j(a)-(d). This instant action triggers subsection (b), merchandise completed in a third country.

> of scope rulings as recognized by 19 C.F.R. § 351.225[(g)-(j)], and they are the only types of scope rulings governed by a specific statutory scheme. *See generally* 19 U.S.C. § 1677(j). . . . [Therefore,] subsection (k) factors do not apply to circumvention scope inquiries.

Def.'s Opp'n at 27-28.  The Court may only review the underlying proceeding that Commerce chose to conduct, which is the anticircumvention inquiry in this case, and therefore any discussion relating to the scope factors pursuant to 19 C.F.R. § 351.225(k) is extraneous and will be disregarded for this review.

### A.     Statutory Framework for Circumvention Inquiries

Circumvention cases are governed by 19 U.S.C. § 1677j.  *See* Pl.'s Mot. at 27; Def.'s Opp'n at 14.  When merchandise is completed or assembled in a third country other than the country named in the antidumping order, as is the case here, the relevant provision is 19 U.S.C. § 1677j(b), which provides, in pertinent part:

> **(b) Merchandise completed or assembled in other foreign countries**
>> **(1) In general**
>> If—
>>> **(A)** merchandise imported into the United States is of the same class or kind as any merchandise produced in a foreign country that is the subject of—
>>>> (i) an antidumping duty order issued under section 1673e of this title,. . .
>>> **(B)** before importation into the United States, such imported merchandise is completed or assembled in another foreign country from merchandise which—
>>>> (i) is subject to such order or finding, or

(ii) is produced in the foreign country with respect to which such order or finding applies,

**(C)** the process of assembly or completion in the foreign country referred to in subparagraph (B) is minor or insignificant,

**(D)** the value of the merchandise produced in the foreign country to which the antidumping duty order applies is a significant portion of the total value of the merchandise exported to the United States, and

**(E)** the administering authority determines that action is appropriate under this paragraph to prevent evasion of such order or finding,

the administering authority, after taking into account any advice provided by the Commission under subsection (e) of this section, may include such imported merchandise within the scope of such order or finding at any time such order or finding is in effect.

**(2) Determination of whether process is minor or insignificant**

In determining whether the process of assembly or completion is minor or insignificant under paragraph (1)(C), the administering authority shall take into account—

**(A)** the level of investment in the foreign country,

**(B)** the level of research and development in the foreign country,

**(C)** the nature of the production process in the foreign country,

**(D)** the extent of production facilities in the foreign country, and

**(E)** whether the value of the processing performed in the foreign country represents a small proportion of the value of the merchandise imported into the United States.

**(3) Factors to consider**

In determining whether to include merchandise

>assembled or completed in a foreign country in. . . an antidumping duty order. . . , the administering authority shall take into account such factors as—
>
>>**(A)** the pattern of trade, including sourcing patterns,
>>
>>**(B)** whether the manufacturer or exporter of the merchandise described in paragraph (1)(B) is affiliated with the person who uses the merchandise described in paragraph (1)(B) to assemble or complete in the foreign country the merchandise that is subsequently imported into the United States, and
>>
>>**(C)** whether imports into the foreign country of the merchandise described in paragraph (1)(B) have increased after the initiation of the investigation which resulted in the issuance of such order or finding.

19 U.S.C. § 1677j(b).  Commerce considers whether the criteria listed under 19 U.S.C. § 1677j(b)(1) are satisfied by considering the factors listed in 19 U.S.C. § 1677j(b)(2) and (3).  However, none of the factors listed under 19 U.S.C. § 1677j(b)(2) or (3) is controlling.[5]  Commerce's authority to apply subsection (b) requires that "there must be some processing taking place in the third-country," in this case the U.K., for Commerce "to determine whether the merchandise is subject to the order."  *Globe Metallurgical Inc. v. U.S.*, 34 CIT __, 722 F. Supp. 2d 1372, 1379 (2010).  Therefore, a breakdown and understanding of UKCG's SDGE production process is essential to Commerce's analysis and to the Court's review.

---

[5]  The only regulatory instruction for 19 U.S.C. § 1677j(b) inquiries is that no "single factor" will "be controlling."  19 C.F.R. § 351.225(h).

B.      Production of SDGE

Defendant-Intervenors provided the following description of the production

process for SDGE, which was taken from the Chinese respondents' Section D

questionnaire responses in the antidumping duty investigation:

> Stage 1: Calcining:[6] In this production process, petroleum
> coke becomes calcined petroleum coke by heating the
> petroleum coke at extreme temperatures over [a period of
> time].[7]
> Stage 2: Crushing: In this stage, calcined petroleum coke
> or imported needle coke are crushed in a series of roller mills
> into fine grains for about half an hour.
> Stage 3: Screening: The crushed and ground calcined
> petroleum coke or imported needle coke are divided into
> different sizes of grains or powders with the use of a
> vibrating sift over approximately a half an hour of
> processing.
> Stage 4: Burdening: The screened coke grains or powders
> are mixed and prepared in accordance with a recipe, which
> takes approximately a half hour.

---

[6] To calcine, in general, is "to heat (as inorganic materials) to a high temperature
but without fusing in order to effect useful physical and chemical changes." *Webster's
Third New International Dictionary* 315 (1981). In the case at hand, according to a
producer of SDGE in China, calcining is when "petroleum coke burns in a spinning kiln
heated by burning volatile elements to 1,380 degree Celsius. During the burning, the
petroleum coke becomes calcined petroleum coke and the high temperature tail gas, a
by-product from burning volatile elements, is used to generate steam which will be
used in the subsequent coal tar pitch preparing stage." *Initiation Request*, Exhibit DA-2,
at 240, Part 1, P.R. 1.

[7] Some amounts of time for the various stages are protected as business
proprietary information so general amounts of time have been given in brackets in these
instances.

Stage 5: Preparing Coal Tar Pitch: Raw coal tar pitch is melted for [a number of] hours to remove the moisture and certain residues.

Stage 6: Kneading: The coke stock from the burdening stage and the prepared coal tar pitch are blended and mixed together for [a period of time] to create a mixture that is used in the next stage, forming.

Stage 7: Forming: The paste from the kneading stage is cooled and then put through an extrusion press to shape the cylindrical column form of the electrode. This process takes [a period of time].

Stage 8: Baking: The cylindrical column form is moved into a baking oven where they [sic] will remain for [a period of time].

Stage 9: Impregnation: The baked electrode will be pre-heated and then placed into an impregnation tank that is filled with melted pitch. The pitch will be impregnated into the electrode to fill the pores and increase the strength of the electrode. This process takes [a period of time].

Stage 10: Re-Baking: The impregnated electrode will be put into a baking oven and heated to coke the pitch in the impregnated electrode, by passing the electrode from a tunnel kiln, inverse-flame calciners, and open calciners for [a period of time].

Stage 11: Graphitization: In this stage, the electrode undergoes graphitization, where the carbon electrode is transformed into a graphitized electrode. It takes [a period of time] to complete graphitization.

Stage 12: Machining: After the graphitized electrode is cooled, it will go through two additional minor processes: shaping of the surface and ends of the electrode to exact size and dimensions; and, tooling and fitting of the ends of the electrode with a threaded graphite connecting pin (a hole is bore [sic] into the ends of the electrode, which is then threaded). In addition, threads are added to the connecting pin. In total, this process takes about [a period of] minutes to complete an electrode.

Stage 13: Packaging: In this process, the electrode is

> placed in a wooden crate with foam end caps placed over the
> ends of the electrode to protect the threading.
>      When summed together, the production process takes [a
> substantial number of] days.

Def.-Intervenors' Resp. Br. ("Def.-Ints.' Opp'n") at 4-6 (citations omitted).  These

thirteen stages of production take place over a substantial number of days, and the first

eleven stages are done in China.  *Id*. at 13.  The record shows that only the finishing is

done by UKCG in the U.K., and Commerce determined at verification that finishing

"takes approximately <u>five</u> <u>minutes</u> per electrode."  *Verification of Responses of U.K. Carbon*

*& Graphite Co. Ltd. in the Anti-Circumvention Inquiry of Small Diameter Graphite Electrodes*

*From the People's Republic of China* at 15 (May 30, 2012) ("*Verification*"), Part 2, P.R. 53; Part

4, C.R. 46.

### C.      Analysis

#### 1.      Parties' Issues

Commerce claims that only subsections 19 U.S.C. § 1677j(b)(1)(B) and (C) of the

circumvention statute are at issue in this case, requiring only determinations of whether

the imports of SDGE are completed abroad from Chinese subject merchandise and, if so,

whether the process of assembly or completion in the U.K. is minor or insignificant.

Def.'s Opp'n at 15.  But Plaintiff lists eight issues in its motion, including "plain

language" issues relevant to a scope inquiry, and concerns about use of surrogate value

for UKCG's production inputs.  Pl.'s Mot. at 1-2.  Upon review of all parties' briefs, the

Court boils down the arguments to four main issues:

> 1.  Whether Commerce's finding that the artificial graphite rods used as inputs in UKCG's production are subject to the scope of the *AD Order* is supported by substantial evidence on the record or otherwise in accordance with law.

> 2.  Whether Commerce's finding that UKCG's process of completion performed in the U.K. is minor or insignificant pursuant to the factors listed under 19 U.S.C. § 1677j(b)(2) is supported by substantial evidence on the record or otherwise in accordance with law.

> 3.  Whether Commerce's use of surrogate values from the Ukraine to value Chinese origin inputs of artificial graphite rods used by UKCG to produce its finished SDGE is supported by substantial evidence on the record or otherwise in accordance with law.

> 4.  Whether Commerce's requirement that UKCG pay a China-wide rate cash deposit is supported by substantial evidence on the record or otherwise in accordance with law.

*See* Pl.'s Mot. at 1-2;  Def.'s Opp'n at 2-3; Def.-Ints.' Opp'n at 2-3.  The Court will address

these four issues within the statutory scheme by reviewing the record for substantial

evidence to support each  statutory criterion.[8]

---

[8]  Defendant's contention that only subsections (B) and (C) are at issue in this case is incorrect.  Plaintiff expounds throughout its briefs that its rods should have been excluded "*ab initio*" from the scope of the order, which triggers subsection (A), and voices various concerns about Commerce's valuation conclusions, which trigger subsection (D).  Pl.'s Mot. at 9, 12.  Therefore, the Court reviews each of the statutory criteria under subsection (b).

2.      **General Criteria**

a.      **Same Class or Kind**

The first statutory consideration is whether the merchandise imported to the U.S. is of the "same class or kind" as merchandise subject to the AD Order.  19 U.S.C. § 1677j(b)(1)(A).  Plaintiff contends that its product—artificial graphite rod—differs from merchandise subject to the *AD Order*—small diameter graphite electrodes.  Pl.'s Mot. at 4-5.  Plaintiff makes much ado about the term "unfinished" and advances that Commerce misapplied the "plain meaning" principle.  *Id.* at 9-10, 15-22.  Finally, Plaintiff relies on the fact that artificial graphite falls under HTSUS 3801.10, which was originally not included as part of the scope description but was subsequently added in the *Final Determination.*[9]  Plaintiff asserts that the merchandise subject to the *AD Order* includes

---

[9]  Commerce stated that it was

> adding this HTS subheading [3801.10] to the scope language of the *SDGE Order* to aid U.S. Customs and Border Protection ("CBP") by clarifying that products categorized under the HTSUS 3801.10 category, as imported, which otherwise fit the narrative description of unfinished products covered by the *SDGE Order* should be considered merchandise subject to the order.

77 Fed. Reg. at 47,598; *see also* Def.-Ints.' Opp'n at 18 ("Petitioners' request to include HTSUS 3801 within the scope language makes clear that they always intended to include both unfinished and finished small diameter graphite electrodes within the scope of the antidumping duty order.").  Plaintiff does not challenge Commerce's authority to alter the scope to add another HTSUS category but asseverates that

graphite electrodes under HTSUS 8545.11 and ergo contends that "items under HTS 3801

were classified and known as something other than an electrode." *Id*. at 5.  Plaintiff

offered as support for its contention a U.S. classification ruling ("CBP ruling") and a

European Union classification ruling ("U.K. ruling" or "BOI ruling") stating that "rods"

were artificial graphite rather than electrodes.  *Id*.

      Defendant-Intervenors advise that Plaintiff's product, artificial graphite rod, is of

the same class or kind of merchandise subject to the *AD Order*.  They explain that

artificial graphite rod is "*an electrode in unfinished form. . . , regardless of whether it is called a*

*rod or an electrode*."  Def.-Ints.' Opp'n at 3 (*citing Initiation Request* at 14) (emphasis

added).  Defendant-Intervenors counter Plaintiff's objection to the term "unfinished" as

ambiguous and instead offer that the term is "quite common in antidumping lexicon and

has been included in the scope language of dozens of antidumping cases," citing

numerous examples.  *Id*. at 15.  Defendant-Intervenors support Commerce's definition of

unfinished SDGE as those which have "gone through all the steps of production,

including graphitization, except for machining or 'finishing.'"  *Id*. at 16.

---

Commerce's alteration to include HTSUS 3801 is an admission of a "knowing and
intentional" omission from the original scope, and thus products classified under
HTSUS 3801 should be considered *ab initio* excluded from the scope.  Pl.'s Mot. at 12, 26.
This argument is neither persuasive nor supported by the record.

        The Court finds that Commerce's affirmative determination regarding class or

kind is supported by the record.  For clarification's sake, while the parties use various

terminology throughout their briefs and on the record—Petitioners characterize the

inputs as "unfinished SDGE" while Plaintiff characterizes the inputs as "artificial

graphite rods"—they are actually one and the same.  *See, e.g., Final Determination*, 77 Fed.

Reg. at 47,597 n.2 ("For ease of reference, these materials are referred to as 'unfinished

SDGE components' or 'artificial graphite rods' throughout this notice.")  Next, regarding

the meaning of the term "unfinished," Plaintiff admits that "there is no evidence on the

record that 'unfinished' has any meaning whatsoever in the trade."  Pl.'s Mot. at 16.

Commerce considered carefully the scope language "whether or not finished," and

determined that "unfinished SDGE" meant "an SDGE product that has completed the

graphitization stage and needs only finishing to be used as a finished SDGE in a

furnace."  Def.'s Opp'n at 19 (*citing I&D Memo* at 5).

        Plaintiff admits that it has never argued that "the HTS categories are

controlling," but asserts that Petitioners "treatment of such categories is <u>relevant</u> in

determining what the Petition meant by the vague term 'unfinished.'"  Pl.'s Mot. at 20.

The Court declines to adopt Plaintiff's position.  It is well-settled that "a reference to an

HTSUS number is not dispositive about the scope" of an antidumping order.  *Novosteel*

*SA v. United States*, 284 F.3d 1261, 1270 (Fed. Cir. 2002) (internal citations omitted); *see*

*also Preliminary Determination*, 77 Fed. Reg. at 33,411.)  Consequently, Plaintiff's HTSUS

arguments are vitiated by settled case law regarding scope determinations.  Despite

Plaintiff's quibbling over the meaning of "unfinished," the Court cannot say that

Commerce's consideration and decision to use Petitioners' definition of "unfinished" is

unreasonable, arbitrary or capricious.

The Court also finds that Plaintiff's argument regarding Commerce's lack of

consideration of the classification rulings is not supported by the record.  Pl.'s Mot. at 24

(contending that it is "flatly false" that Commerce "ever addressed, considered, or took

into account" the U.K. and U.S. classification rulings).  Commerce stressed that it

considered the classification rulings, both foreign and domestic, and then explained

throughout the record why it did not rely on these rulings.  *See, e.g., Initiation Notice*, 76

Fed. Reg. at 14,917 ("neither the BOI nor the [CBP] ruling are legally binding for the

purposes of antidumping proceedings in the United States"); *Preliminary Determination*,

77 Fed. Reg. at 33,410 ("U.S. and E.U. customs rulings are not controlling" in

anticircumvention proceedings, "as the two determinations are made for different

reasons and under different laws"); *I&D Memo* at 6 ("Contrary to UKCG's assertion,

[Commerce] has indeed considered this information and taken the various rulings and

actions into account in the instant determination.")  Commerce has provided ample

reasoned explanations for its decision to not rely on the classification rulings.

Accordingly, the Court finds that Commerce's determination that Plaintiff's artificial graphite rods are "of the same class or kind" as the subject merchandise of the *AD Order*, satisfying 19 U.S.C. § 1677j(b)(1)(A), is supported by substantial evidence on the record and otherwise in accordance with law.

### b.      Completed in a Third Country

The second statutory consideration is whether imported merchandise is completed or assembled in a third county from merchandise which is either subject to the order or is produced in the country to which the order applies.  19 U.S.C. § 1677j(b)(1)(B).  Commerce "made an affirmative determination as to both" of the statutory criteria—(i) being subject to an order[10] or (ii) being produced in the foreign country with respect to which such order of finding applies—even though only one needs to be satisfied.  Def.'s Opp'n at 17; *see also* 19 U.S. C. § 1677j(b)(1)(B); *Final Determination*, 77 Fed. Reg. at 47,598.

Plaintiff asserts that subsection (ii) was not considered in the underlying administrative proceeding.  Pl.'s Reply Br. in Supp. of Its Mot. for J. on the Agency Record ("Pl.'s Reply") at 5 ("Commerce is not compelled to utilize both (i) and (ii) but

---

[10]  Even though "Commerce rarely conducts a scope analysis [under] subsection (b)(1)(B)(i) in anticircumvention proceedings," in this case, Commerce "concluded also that the China-sourced artificial graphite rods are 'subject to', *i.e.*, 'specifically covered' under the scope of, the *SDGE Order*."  Def.'s Opp'n at 18 (*citing I&D Memo* at 3-7).

instead may utilize either provision. . . . [it] did so here by analyzing (i). . . . [n]ever once

did it analyze or mention (ii).")

A review of the record does not support Plaintiff's assertion.  In the *I&D Memo*,

Commerce stated:

> the fact that UKCG's artificial graphite rod/unfinished SDGE
> component inputs—the sole input utilized by UKCG in the
> production of finished SDGE subject to this inquiry—are
> produced in [China] has never been contested on the record of
> this proceeding nor is this fact disputed for this final
> determination. . . . in this case, there is no dispute that the input
> in question is produced in the country subject to the AD order.

*I&D Memo* at 7.  Commerce's conclusion is supported on the record.  It is sufficient that

Commerce reached a conclusion pursuant to subsection (ii), that UKCG's inputs were

produced in China, a country to which the AD Order applied.  Commerce, however,

went further and analyzed the scope language of the *AD Order*, the petition and the ITC

Report to determine if Plaintiff's inputs were subject to order pursuant to subsection (i).

*I&D Memo* at 6-7.  Commerce found that the plain language of the scope order includes

UKCG's inputs where it indicates "small diameter graphite electrodes, whether or not

finished."  *AD Order*, 74 Fed. Reg. at 8,775; ITC Report at I-9; *I&D Memo* at 5.

Thus, the Court finds that both of Commerce's determinations—that Plaintiff's

artificial graphite rods are produced from input materials covered under the scope of the

*AD Order* and that Plaintiff's exports are finished from inputs produced in

China—satisfy 19 U.S.C. § 1677j(b)(1)(B), are supported by substantial evidence on the

record, and are otherwise in accordance with law.

### c.    Minor or Insignificant Completion

The third statutory consideration is whether the process of "assembly or

completion" in the foreign country, in this case the U.K., is "minor or insignificant."  19

U.S.C. § 1677j(b)(1)(C).  The statute provides five factors to consider when conducting a

"minor or insignificant" analysis:

> **(A)**  the level of investment in the foreign country,
> **(B)**  the level of research and development in the foreign country,
> **(C)**  the nature of the production process in the foreign country,
> **(D)**  the extent of production facilities in the foreign country, and
> **(E)**  whether the value of the processing performed in the foreign country represents a small proportion of the value of the merchandise imported into the United States.

19 U.S.C. § 1677j(b)(2).  None of the five factors is dispositive.  Uruguay Round

Agreements Act, Statement of Administrative Action, H.R. Rep. No. 103-316, at 893

(1994), *reprinted in* 1994 U.S.C.C.A.N. 4040, 4216 ("SAA").  Commerce is to evaluate the

factors "depending on the particular circumvention scenario" on a case-by-case basis.  *Id.*

In its underlying determination, Commerce compared in each country the level

of investment, "both in initial capital and equipment," the production facilities, the

processes performed, and the number of production employees in each country (China

and the U.K.).  *Preliminary Determination*, 77 Fed. Reg. at 33,412.  Commerce found that

research and development ("R&D") is not a significant factor in this case, because

Plaintiff did not provide "any substantial evidence of R&D programs or expenditures."

*Id.*

        Regarding the value-added factor, Commerce found that "aside from the cost of

labor and energy, UKCG did not consume or impart any additional direct material

inputs to produce the finished SDGE" and found that "the value of the energy and labor

consumed by UKCG in the production of the finished SDGE" is insignificant.  *Id*. at

33,313.  Commerce weighed all the factors and found that "the nature of the production

process and extent of the production facilities in the U.K. are minor in comparison to

those utilized in [China] for the production of the unfinished [SDGE] components

sourced from [China]," explaining that Chinese producers "have invested extensively in

the SDGE industry, which includes significant investment in both manufacturing

facilities and production equipment worth millions of dollars, the bulk of which goes to

the heavy industrial processes required for the production of SDGE. . . . which occur[s]

prior to the final machining stage."  *Id.*

        In the instant action Plaintiff only challenges subsection (E), the value-added

factor.  Pl.'s Mot. at 32-38; Pl.'s Reply at 20.  The Court notes that the five factors are to be

separately taken into consideration, as appropriate, and their totality weighed.

Commerce "performed a qualitative and quantitative value-added analysis" pursuant to

19 U.S.C. § 1677j(b) and "found that they both supported the conclusion that the value of

the processing performed in the U.K. represents a 'small proportion' of the value of the

merchandise imported into the United States."  Def.'s Opp'n at 33 (*citing I&D Memo* at

10, *Preliminary Determination*, 77 Fed. Reg. at 33,413); *see also* SAA at 894.

Examining the breakdown of the production process for SDGE placed on the

record by Defendant-Intervenors, all but five minutes of the production process that

takes a substantial number of days is done in China.  *Verification* at 15.  Given the

information on the record—breakdown of the production process, facility and employee

number comparison, and relative gross value amounts—the Court cannot say that

Commerce's conclusion that UKCG's finishing touches are minor or insignificant is

unreasonable, arbitrary or capricious.

Upon review of the SDGE  manufacturing process, the detailed information

presented by Petitioners, and Commerce's weighing of all the factors with the

information placed on the record, the Court finds that Commerce's determination that

the manufacturing completed in the U.K.—five minutes of finishing—is minor or

insignificant, satisfying 19 U.S.C. § 1677j(b)(1)(C) and § 1677j(b)(2), is supported by

substantial evidence on the record and otherwise in accordance with law.

### d.    Value of Merchandise

The fourth statutory consideration is whether the value of the merchandise produced in the foreign country to which the antidumping duty order applies—here, China—is a significant portion of the total value of the merchandise exported to the U.S. 19 U.S.C. § 1677j(b)(1)(D).  The statute is silent, however, about the definition of "value" in the context of a NME in the circumvention provisions.  *See* 19 U.S.C. § 1677j; Def.'s Opp'n at 38.  It is well- established that where a statute is silent, an agency may fill in the gap and courts must defer to that interpretation as long as it is "based upon a permissible construction of the statute."  *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 843 (1984).

Commerce, faced with the need to evaluate value in a NME, chose to apply the surrogate value methodology used in other antidumping proceedings to arrive at an accurate valuation of UKCG's inputs, explaining that "the same concerns about the reliability of NME prices that underlie its normal valuation calculation also underlie its analysis of circumvention of an order imposed upon NME-origin merchandise."  Def.'s Opp'n at 39 (*citing I&D Memo* at 8).  Determining that "the actual prices that UKCG paid for its Chinese-sourced artificial graphite rods are 'inherently unreliable'"as products of a NME, Commerce chose to use surrogate values from the Ukraine.  Def.'s Opp'n at 37 (*citing I&D Memo* at 8).  Commerce used Ukrainian surrogate values for artificial

graphite rods in calculating "the value of the merchandise produced in [China] to which

the [*SDGE Order*] applies." *Id*.  In doing so, Commerce rejected Plaintiff's contention that

the proper method for a value-added analysis was to examine the difference between the

input price and the U.S. sales price.  *Id*. at 35-36.

The Court defers to Commerce's decision to use a surrogate value methodology

in determining the value of inputs from a NME country in an anticircumvention inquiry,

because it is a reasonable construction of the statute.  Upon review, the Court finds that

Commerce's determination that the value of the merchandise produced in China was a

significant portion of the total value of the merchandise exported to the U.S., satisfying

19 U.S.C. § 1677j(b)(1)(D), is supported by substantial evidence on the record and

otherwise in accordance with law.

### e.      Other Factors

The circumvention statute also lists other factors to consider in determining

whether to include merchandise assembled or completed in a foreign country in an

antidumping duty order.  19 U.S.C. § 1677j(b)(3).  These factors include pattern of trade,

company affiliations, and import increases.  *Id*.  These (b)(3) factors are not at issue in this

case, because UKCG does not challenge Commerce's consideration of them.  *See* Def.'s

Opp'n at 16 n.5; *see generally* Pl.'s Mot.

3.    **Other Issues**

a.    **Deposit Rate**

Plaintiff challenges Commerce's decision to apply the China-wide cash-deposit

rate to its exports to the U.S., claiming this decision is simultaneously punitive and

erroneous, and requests relief in the form of a separate rate.  *See* Pl.'s Mot. at 38-40.

Because it is "not under the control of any governmental entity of China," Plaintiff urges

that if a rate is to be applied at all, it is "entitled to the current separate rate."  *Id*. at 38.

Further, Plaintiff argues that it "has done everything in its power to provide information

to [Commerce] to avoid being placed in the punitive China-wide category."  *Id*. at 39.

Plaintiff explains that it already attempted to obtain a separate rate but its "application

became moot when [Commerce] determined that UKCG did not have reviewable entries

for that review."  *Id*.  Commerce points out that Plaintiff may "request an administrative

review of its exports" so that Commerce may "determine the final dumping liability

through the standard administrative process."  Def.'s Opp'n at 48 (*quoting I&D Memo* at

15).

In the meantime, in accordance with its past practice in circumvention cases,

Commerce found it "appropriate to instruct [CBP] to collect a cash deposit at the

[China]-wide rate, consistent with [Commerce's] standard practice to assign the [China]-

wide rate to non-reviewed exporters."  *I&D Memo* at 15.  Commerce also notes that it has

"made no final determination of dumping with respect to UKCG." Def.'s Opp'n at 48

(*citing I&D Memo* at 15, *Final Determination*, 77 Fed. Reg. at 47,600).

The Court finds that Commerce's determination to apply a China-wide rate as a

cash deposit to UKCG  is supported by substantial evidence on the record and otherwise

in accordance with law.  To the extent that UKCG seeks a remedy regarding the cash

deposit rate that it has not yet sought through normal administrative channels, the Court

declines to grant relief due to the failure to exhaust administrative remedies.  *See* 28

U.S.C. § 2637(d).

## b.      Remaining Issues

The Court has considered the remaining arguments and found them to be either

subsumed into the analysis above or without merit.

## CONCLUSION

As a result of the considerations detailed above, the Court holds that Commerce

based its circumvention determination on substantial evidence on the administrative

record and acted in accordance with law.  Consequently, it is hereby

ORDERED that *Small Diameter Graphite Electrodes From the People's Republic of*

*China: Affirmative Final Determination of Circumvention of the Antidumping Duty Order*, 77

Fed. Reg. 47,596 (Aug. 9, 2012) is sustained; and it is further

**Court No. 12-00242**                                                                              **Page 31**

ORDERED that Plaintiff's motion for judgment on the agency record is denied;

and it is further

ORDERED that the stay entered by the Court on Plaintiff's motion for oral

argument (ECF No. 51) is hereby lifted; and it is further

ORDERED that Plaintiff's motion for oral argument (ECF No. 50) is hereby denied.

Judgment to enter accordingly.


                                                                    /s/ Gregory W. Carman
                                                                 Gregory W. Carman, Judge

Dated:  August 29, 2013
            New York, New York